Filed 8/28/25  In re Aiden C. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re AIDEN C., a Person Coming Under Juvenile Court Law. | B342549 |
| | (Los Angeles County Super. Ct. No. 18CCJP07889) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| A.R., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Lillian Hamrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

_____

In October 2024, the juvenile court denied a petition brought by appellant mother A.R. under Welfare and Institutions Code section 388 asking the court to return her son Aiden C. (born May 2013) to her care or, in the alternative, reinstate reunification services.[1]  Immediately afterward, the court appointed a legal guardian for Aiden in a section 366.26 hearing.

On appeal, Mother contends the juvenile court erred in denying the section 388 petition because she demonstrated both changed circumstances and that her request was in Aiden's best interest, and erred in appointing a legal guardian for Aiden "because the court's section 366.26 findings and orders were reached only after the improper denial of mother's section 388 petition."[2]  Finding no error, we affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother also initially claimed that the court's written minute order arising from the section 366.26 hearing incorrectly reflected the visitation order orally articulated by the court but has since conceded this argument, after DCFS pointed out that a second, correct minute order was entered a few minutes after the incorrect one.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.  *Prior Child Welfare History*
Before the referral that occasioned this case, DCFS received seven referrals concerning Aiden.  In June 2015, DCFS received a referral for physical and emotional abuse—the physical abuse was deemed unfounded, and the emotional abuse inconclusive.  In October 2015, DCFS received a referral for physical abuse that was deemed inconclusive.  In May 2016, DCFS received a referral for general neglect and physical abuse—the general neglect was substantiated and the physical abuse unfounded.  From May 2016 to February 2017, the family had a voluntary family maintenance case; Mother did not fully complete her services and objectives during that time but promised to continue with her services after the case closed.

In July 2017, DCFS received a referral for emotional and physical abuse—all allegations were deemed inconclusive.  In October 2017, DCFS received a referral for physical abuse that was found inconclusive.  In April 2018, DCFS received a referral for physical abuse that was found inconclusive.  And in June 2018, DCFS received a referral for general neglect, physical abuse, and emotional abuse—the allegations were found inconclusive and unfounded.

### B.  *DCFS Investigates a Referral*
In November 2018, DCFS received a referral reporting that a child said his stepfather broke his hand; the child's mother claimed the child broke his hand playing a "coin video machine"

---

[3] We limit our summary to the facts and procedural history relevant to the issues appellant raises on appeal.

at the laundromat. There was also suspicion of "coaching" as, after the child stated the stepfather broke his hand, Mother spoke to him in Spanish. The reporting party relayed that "hospital staff reported the child reported that he was trying to get a coin out of a machine and the step father [*sic*] grabbed his wrist really hard." Tests showed no fracture or dislocation or swelling.

### 1.    Initial Investigation

A children's social worker (CSW) responded to the hospital where the child—Aiden—was being treated, and clarified that "stepfather" referred to Mother's boyfriend, Luis. A nurse informed the CSW that Mother "admitted to law enforcement that the child was playing with a video game when [step]father grabbed the child's hand, possibly causing the injury."

The CSW spoke with Mother, who was with her newborn, Anthony (born October 2018).[4] Mother explained that, while at a laundromat, Aiden became upset when she refused to give him quarters for the video game machines there. Aiden began having a tantrum, wanting to go where the machines were, and Luis grabbed him by the arm. Aiden tugged his hand from Luis's grip and began complaining of pain shortly afterward. When the complaints continued even after the family had returned home, they brought Aiden to the Emergency Room. Mother denied Luis intentionally hurt or ever abused Aiden. Mother claimed Aiden

---

[4] Both Mother and Luis denied he was Anthony's biological father but both stated Luis "gave the child his last name and is listed on the child's birth certificate"; Luis added he had "adopted" Anthony. Anthony and Aiden have different biological fathers.

4

talked back to her a lot and challenged her when she tried to set rules and boundaries. Luis lived with the family and helped with the bills and childcare.

Mother denied any domestic violence issues with Luis but reported "multiple incidents" of domestic violence with Aiden's father Juan C., against whom she had a restraining order.[5] Mother stated Father both abused Aiden and abused her in front of Aiden. Mother also stated Aiden had been receiving behavioral therapy but "she stopped taking him a couple of months ago because . . . the child's therapist insisted mother allow the child to have contact with father." Mother denied any current drug use, although she admitted to smoking "rock" before she was pregnant with Aiden. The CSW noted that throughout the interview, she "had to often repeat the questions to mother in both English and Spanish, as mother would at times provide answers that were irrelevant to the questions being asked."

The CSW spoke with Aiden, who first refused to tell her what happened, then stated he did not know. When pressed, Aiden revealed he had gone with Mother and Luis to wash a lot of dirty clothes. Eventually, he claimed he broke his hand jumping from the bed; he denied anyone else caused the injury. He also denied any physical abuse or discipline by Mother but claimed that when Luis picked him up from school on Friday, Luis hit his left knee with a belt. Aiden stated Luis had hit him other times in the left knee with a belt.

---

[5] In her application for a restraining order, Mother stated that when Father dropped Aiden off after spending the day with him, he became "very aggravated" and drunkenly pushed her into a door while she was holding Aiden. Mother also stated Father had threatened to hit her in the past.

The CSW spoke with Luis who reported he had been at the laundromat with the family when Aiden started "running around." Luis grabbed his arm to get him to stop, but Aiden "started pulling himself and started crying." When the pain persisted, they brought Aiden to the hospital. Luis denied intentionally hurting Aiden or ever hitting Aiden.

## 2. Continued Investigation

Ten days later, a second CSW spoke with Mother, Luis, and Aiden at the family's home. The gist of Mother's and Luis's story regarding Aiden's injury remained the same. Aiden now said he was injured when Luis "carried him" at the laundromat. Aiden denied corporal punishment but "did not respond when asked if . . . Luis used any discipline with him." Luis denied any corporal punishment.

In late November 2018, Luis tested negative for all substances but Mother tested positive for methamphetamine. When the CSW spoke with Mother about the test, she admitted to experimenting with "crack" in the past, claiming she last used it before her recent pregnancy. When the CSW explained the drug test Mother took "reflect[s] approximate detection times of about 1 or 2 days"—meaning it would have been impossible for Mother to test positive after almost a year—"Mother remained silent." After the CSW commended Mother for not taking any substances while pregnant, Mother "broke down" and stated she had used "Friday[,] maybe a little."[6] Mother refused to provide any more details about her drug use but agreed to enroll in an outpatient drug treatment program. Mother later had her sister

---

[6] Mother had drug tested on a Saturday.

enroll her in a program; the sister told the CSW Mother denied having a substance abuse problem.

## C.   *The Court Detains the Children*

In December 2018, DCFS obtained a removal order for the children, who were placed into foster care. Two days later, DCFS filed a petition on behalf of Aiden and Anthony under section 300, subdivisions (a), (b)(1), and (j). Counts a-1, b-1, and j-1 identically alleged that Luis struck Aiden with a belt, causing unreasonable pain and suffering, and that Mother failed to protect Aiden, endangering both children. Count b-2 alleged Mother had a history of substance abuse and was a current user of amphetamine and methamphetamine, rendering her incapable of caring for the children.

At the detention hearing, the court found a prima facie case for detaining the children and granted Mother and Luis monitored visits. The court also ordered DCFS to investigate whether the children could be placed with maternal great-aunt Julia G., granting DCFS discretion to place the children with her if appropriate. The children were subsequently released into Julia's care.

## D.   *DCFS Continues Investigating*

### 1.   **Aiden**

When a dependency investigator (DI) spoke with Aiden in early 2019, when he was almost six years old, he claimed Luis "broke my hand." He explained they were at a laundromat when Luis grabbed his wrist. Aiden also reiterated Luis would hit him with both a belt and a sandal, and would hit him "sometimes one

7

time, sometimes three times." Aiden claimed to have "bruises all over and red."

Aiden did not know what drugs were but reported Mother and Luis both "smoked."

### 2. Mother

The DI spoke with Mother, observing that Mother "has a difficult time following a conversation"; the DI often had to rephrase questions in order to help Mother understand.

Mother denied Luis ever hit or hurt Aiden with a belt, sandal, or anything else. She repeated her previous explanation that the family had been at a laundromat when Aiden threw a tantrum because she would not give him a quarter to play on a video game machine. Aiden hurt his hand pulling away from Luis, who had grabbed his arm. Mother told the DI, "I knew he was going to say I hurt him, we are working on saying the truth because he lies a lot." When the DI explained that Aiden reported Luis had hurt him, Mother responded: "It's a lie, I can't believe my own son is doing this to me, I told him[, if] you keep saying these things, I'm never getting you back, just say 'bye bye' to mommy, you're stupid." She claimed she and Luis were still cohabiting and in a romantic relationship.

Mother denied using any drug other than crack, which she stated Father introduced her to when she was pregnant with Aiden. She used it twice or thrice daily throughout her pregnancy, stopping when Aiden was around three years old, because "it made me skinny, depressed." However, she started using it again when she met Luis three years ago because she felt "depressed." She returned to using it twice or thrice daily. She stated the last time she used cocaine was September 2018. She could not explain why she tested positive for methamphetamine

and claimed she did not know what amphetamine or methamphetamine was. She denied ever smoking cocaine at home or in front of the children. She claimed her drug use did not interfere with her ability to care for the children and added that "although she would be 'all drugged out, all stupid' she would still take the child Aiden to school daily. She stated cocaine helped her go to work even though she would go 'all drug addict.'" In February and March, Mother missed two drug tests and tested negative once.

Mother visited Aiden thrice weekly; each visit lasted two hours. Julia reported Mother behaved appropriately during the visits.

In a March 2019 conversation with a therapist treating both Aiden and Mother, the therapist voiced her belief that Mother "may have a mental delay." She elaborated that Mother "did not seem to understand basic instructions and may have a hard time with understanding the Court proceedings and orders."

### 3. Father

Father stated he had not seen Aiden since July 2018, when Mother obtained a restraining order. He claimed that during many visits with Aiden, Aiden would have bruises he could not explain. He also claimed that, in his presence, Mother threatened to hit Aiden if Aiden told Father what happened. Father denied ever hitting Mother and claimed Mother was only able to obtain the restraining order because he went to the wrong courthouse the day of the hearing.

Father claimed Mother had been using methamphetamine since he met her in 2012. When Mother became pregnant with Aiden, she told Father she stopped using drugs, but he suspected she had not. Father stated Mother separated from him when

9

Aiden was about six months old; thereafter, she would sometimes send him pictures of alcohol bottles and coolers filled with beer. Father denied using any drugs or having alcohol issues. He agreed to drug test but then claimed he could not because he lacked valid identification. "Despite the Department making several efforts to drug test the father due to his suspected drug use, the father has not provided a picture of himself so the Department can give him an identification letter to drug test." Father also did not try to schedule visits to see Aiden.

Father appeared at an April 2019 hearing. Although non-offending under the petition, he submitted to the court's jurisdiction. The court ordered monitored visitation for Father. The order specified "[v]isits [were] to be monitored by a Department of Children and Family Services approved monitor in a Department of Children and Family Services approved setting."

### 4. Paternal Grandmother and Paternal Aunt

The DI spoke with the paternal grandmother (PGM), who stated Father often lived on the streets, occasionally stopping by her home to eat, sleep, or shower. PGM added that when Father would arrive at her house, he would be "filthy and under the influence of either drugs or alcohol." PGM stated Father had never taken appropriate care of Aiden and "she often found the child dirty, hungry and playing with his electronics" while in Father's care. She described Father as "aggressive," claiming he "steals, lies excessively and has many legal issues."

The paternal aunt confirmed Father lacked stable housing and often lived on the streets "for days." The aunt stated Father did not work and smoked marijuana.

10

### 5. Luis

Luis reported that, as of January 8, 2019—two weeks before the DI spoke with Mother—he had not lived with Mother, was no longer in a romantic relationship with her, and wanted nothing to do with either child. Luis denied intentionally hurting Aiden and repeated his claim that the injury occurred when he grabbed Aiden by the wrist at a laundromat, and Aiden fought to free himself. Luis denied ever hitting Aiden with a belt but admitted hitting him once on the buttocks with a sandal. He denied ever leaving Aiden with any bruises or redness.

Luis stated that, after living with Mother for three months, he discovered she smoked methamphetamine. He estimated she smoked on a weekly basis and had seen her care for the children while under the influence.

### E. *The Court Removes the Children*

At the May 2019 adjudication and disposition hearing, the court granted Luis's motion to set aside his previous voluntary declaration of paternity and declared he had no "paternal findings" in the case. The court then dismissed counts a-1 and j-1 and accepted Mother's no contest plea to a slightly modified count b-1 and b-2, finding those counts true.[7]

The court removed the children from Mother and granted her thrice weekly visits, three hours per visit, unmonitored if in

_____

[7] Count b-1 was modified to read that Luis only struck Aiden once with a belt (as opposed to "[o]n prior occasions") and that Mother was "unable" to protect Aiden (rather than stating she "failed" to do so). Count b-2 was modified to read that Mother was a "recent user of methamphetamine" (instead of a "current abuser of amphetamine and methamphetamine").

11

maternal great-aunt Julia's home, and monitored elsewhere.[8] The court granted Father monitored visitation with the same frequency and duration. The court also ordered Mother to undergo drug treatment and random drug testing and to attend parenting classes and mental health counseling.

### F.   *Six-Month Review Hearing*

A November 2019 status report stated Aiden was doing well in Julia's care, although he exhibited behavioral issues at school. Mother visited Aiden consistently and worked hard to bond with him. Aiden's therapist stated Mother showed up to every session and was open to learning the therapist's parenting techniques. In October 2019, DCFS permitted Mother to have unmonitored visits outside Julia's home.

Mother was reported to be following the court's case plan, attending individual counseling, parenting classes, and a 12-step program. Mother tested negative in seven random drug and alcohol tests administered by the program. Mother also missed several random drug tests requested by DCFS; she claimed she was unable to follow the instructions for testing and did not hear the letter of her last name when she called in to find out whether she needed to test. Between May and October 2019, Mother tested negative eight times and missed eight tests. Mother's counselor noted she seemed to have some developmental delay and sometimes became upset or emotional when she did not understand what was being discussed. Anthony's therapist made a similar observation.

---

[8] Julia was to be present in the home but did not need to be around Mother "all the time."

Father visited Aiden thrice but "has not made an effort to continue the visits." Father also was not following his case plan.

At the November 2019 six-month review hearing, the court continued reunification services for Mother but terminated them for Father. The court admonished Mother to consistently participate in drug testing and granted her permission to have overnight visits with the children in Julia's home.

### G. *Twelve-Month Review Hearing*

The children continued to do well in Julia's home. Mother continued visiting them, and Julia opined that Aiden loved Mother and enjoyed the visits. Aiden said he wanted to live with Mother and felt happy and safe with her.

In mid-July and late August 2020, Mother tested positive for methamphetamine. Mother denied taking any methamphetamine but admitted she had been taking "pain medication." Mother continued participating in parenting classes and individual therapy. She completed her drug-treatment program.

At the September 2020 twelve-month review hearing, the court found that, due to the recent "relapse," Mother was only in partial compliance with her case plan. However, the court expressed optimism this was just "a little bit of a setback," and Aiden could be returned to Mother at the next hearing. The court continued reunification services.

### H. *Eighteen-Month Review Hearing*

Mother tested positive for methamphetamine on September 15, 2020, October 5, 2020, November 9, 2020, and December 10, 2020. She also missed two tests. Mother "denied using any type of narcotic or being around a user of any type of drug" and "stated

that she believes that the testing location is to blame for the positive drug tests." However, from mid-December 2020 to the beginning of March 2021, Mother took 12 drug tests and tested negative each time.

At the March 2021 eighteen-month review hearing, the court ordered continued family reunification services and ordered Mother to attend an in-patient drug treatment program.

### I. *Twenty-Four-Month Review Hearing*

From January to September 2021, Mother drug tested weekly, testing negative each time for all substances. DCFS reported she had completed all court-ordered services. At the October 2021 review hearing, the court ordered the children returned to Mother, with six months of family preservation services.

### J. *Section 364 Hearing*

According to an April 2022 status report, Mother continued testing negative for all substances. Mother reported being stressed and asked to re-enroll in therapy. DCFS received four referrals: one in January 2022, two in February 2022, and one in March 2022. The January 2022 referral alleged Mother slapped Father, thereby causing emotional harm to the children; the allegations were deemed unfounded.

The first February referral alleged Aiden had told Mother the previous day he needed to bring snacks to school for a celebration; she became very upset and began hitting him. The reporting party also stated Mother had claimed Aiden was trying to manipulate her. Mother elaborated that during the Thanksgiving break, Aiden said he would tell his teacher Mother was hitting him so Mother would go to jail, and Aiden could

14

return to his previous "foster family." When a CSW investigated, Aiden claimed Mother did hit him. When asked how, Aiden stated Mother scratched him and showed the CSW marks on his cheek that resembled scratches. When the CSW asked if Mother had hit him in the past, he responded she did not hit him "that much." Aiden stated Mother hit him when he misbehaved. A police report indicates Aiden told a police officer Mother "has hit him with a shoe and her hands while pointing to his upper body and his legs."

When asked about the scratches, Mother reported she "accidentally scratched the child's face." Mother explained the two were walking to school when Aiden became angry that Mother lacked the funds to buy him a treat. Aiden swore at Mother, began to run away from her, and, when she told him to stop, threw himself on the ground. Mother's response "was to grab the child's face." Mother told police that when Aiden "does not get what he wants he scratches himself to get attention." DCFS deemed the allegations inconclusive.

The second February 2022 referral alleged Aiden had accused Mother of hitting him twice on the head with a closed fist, kicking him in the leg, and trying to break his pinky finger. When Mother was asked about the allegations, she stated she had spanked Aiden for running away from her in the morning, and he had responded by threatening to speak to a teacher and have Mother sent to jail. When a CSW spoke with Aiden, he reported Mother scratched him and pulled his pinky. Aiden also stated Mother had hit him that morning, but not in the head. He did not know why Mother hit him. The CSW saw no visible marks or bruises, and Aiden did not appear to be in pain. DCFS deemed the allegations inconclusive.

The March 2022 referral alleged the maternal grandfather hit Mother twice on the head; these allegations were deemed inconclusive.

In March 2022, a nurse practitioner spoke with both Mother and Aiden about suspected child abuse. As soon as the examiner entered the room where both Mother and Aiden were waiting, Mother immediately began complaining about Aiden, accusing him of misbehaving and lying. When asked what Aiden did that made her happy, Mother "looked at this examiner blankly and did not have anything to say and was shaking her head." When the examiner spoke privately with Mother, she "stated she wants Aiden to be taken to foster care but not his brother. Mom reports she cannot handle Aiden." However, she later said tearfully that DCFS "better not take away Aiden . . . because she does not know what she would do."

At the April 2022 section 364 hearing, the court loosened Mother's drug testing requirements to testing only if DCFS had a reasonable suspicion she was using and continued the section 364 hearing for three months so DCFS could assist Mother with moving out of the home she shared with her parents.

### K.    DCFS Files a Section 342 Petition

In May 2022, DCFS received a referral alleging Mother was physically abusing Aiden. Aiden had shown his teacher a bruise on his arm, explaining Mother had become upset and forced him to shower when he did not want to. While in the shower, Mother hit him on the arm "with something from the shower." The bruise appeared new and had not been there the previous day.

A CSW spoke with Mother. Mother claimed she and Aiden were struggling in the shower. Aiden wanted the showerhead removed and, when she removed it, he pulled it from her and lost

16

his balance. She grabbed his wrist to prevent him from falling. Mother also reported that the day before the shower incident, Aiden had told Mother to hit him and called her a "Fucking hole [*sic*]." Mother claimed Aiden verbally provoked and hit her. Mother told the CSW she was thinking of changing schools because she believed that would stop DCFS involvement in her life. She also told the CSW that if Aiden misbehaved, she would spank him. She asked, "How should I respect him when he doesn't respect me?"

The CSW spoke with Aiden and asked how he sustained the bruise on his wrist. Aiden reported that Mother grabbed his arm. He added that Mother told him "he will not be getting a cake as a result of this investigation because mother believes he is lying." Aiden explained he did not want to shower with Mother because he did not want a woman to see his body. Aiden later told a family nurse practitioner who examined him that, while in the shower, he was "screaming at [Mother] and telling her to stop touching me with the shower thing. I didn't like it[,] and she hit me for that." Mother told the same nurse practitioner: "I tell him to keep his mouth shut when I whoop him because I need to teach him the consequences of his actions. He always wants me to hurt him and I ask him what I am doing wrong. I will leave him with my mom where he is bad. I don't know how to handle him. He didn't want to shower himself. He wanted to take the shower head off. I took it from him and he was falling and I grabbed him. I pulled him tight to try and control him. He was kicking at me. He had a bad behavior problem. My dad talks to him about what he does, but he will even spit on him. I always want to find out what to do to make things better. I want to fix things."

17

A CSW also spoke with one of Aiden's teachers regarding an inconclusive referral from February 2022, in which Aiden accused Mother of hitting him after he told her he needed to bring snacks to school the next day. The teacher told the CSW that Aiden had said to her, "I'm not supposed to talk to you. I'm supposed to be quiet. Mom said if I say anything again she's going to hit me hard." The teacher added she had spoken to Mother, "who reported she was upset because the child is not being truthful and mother denied hitting the child Aiden."

In June 2022, DCFS sought an order to remove Aiden from Mother's care. The court granted DCFS's request, and Aiden was again placed with maternal great-aunt Julia. When a CSW asked Aiden if he knew why he was being removed, he responded it was because he lied.

Four days later, DCFS filed a section 342 petition on behalf of the children, under section 300, subdivisions (a), (b)(1), and (j). Counts a-1, b-1, and j-1 identically alleged Mother physically abused Aiden, including bruising his wrist in May 2022, scratching his face in February 2022, and striking Aiden with a shoe, a showerhead, and her hands, which endangered both children. The court found a prima facie case to detain Aiden.[9]

### L.    *The Court Removes Aiden*

Mother re-enrolled in parenting classes and individual therapy and consistently visited Aiden. When a DI tried to ask her about the most recent allegations, Mother "immediately expressed frustration and anger" with Aiden's school, blaming it for "interrogat[ing]" him. After a few minutes, Mother explained

---

[9] No findings were made as to Anthony, and he was not detained.

that Aiden's wrist got bruised because she grabbed it to prevent him from falling in the shower and, when she did so, the showerhead fell off the wall and hit him.  She later stated she was holding the showerhead in her hand and, when she reached for Aiden, she released the showerhead, causing it to fall on Aiden's wrist.  Mother refused to discuss the incident where Aiden's face got scratched.

Later in the interview, Mother complained, "Aiden is a manipulator.  He has an anger problem and he threatened me.  I couldn't touch him.  He threw shoes at me.  You think I'm going to let him mistreat me?"  She related an incident in which she refused to give Aiden her phone and he responded, "If you don't give me the phone[,] bitch[,] I'm going to fuck you up."  Mother added that when she spoke with Aiden on the phone and he said he missed her, she would tell him she did not miss him, so Aiden could learn how to respect her.  Mother said, "I know I was a drug addict[,] but I'm changing."  Mother claimed she disciplined Aiden by raising her voice, and that she has told him:  "[I]f you want to come back, you have to change; you have to prove that you really miss me.  You made this happen."  She added that she told Aiden, "Don't tell people at school when I scold you."

A DI spoke with Aiden about the most recent allegations; he was constantly evasive and avoided answering questions about the incident.  When asked if he knew why he was removed the most recent time, Aiden answered, "Yes, because I told the school that my mom hits me but it was not true.  She does hit me when I don't listen."  However, when asked about the bruise on his wrist, he reiterated it resulted from Mother hitting him with the showerhead because he was refusing to shower.  As for the scratches on his face, Aiden confirmed he had run away from

19

Mother after a disagreement about buying juice for a birthday celebration at school, and Mother grabbed and scratched him. Aiden also discussed an incident in which Mother pulled his shirt from the back, causing a little pain and a scratch. Mother apologized and put makeup on his neck to cover the mark. When asked what happened to him when he disobeyed Mother, Aiden was uncomfortable and said, "I don't know, I forgot."

At the August 2022 adjudication hearing on the section 342 petition, the court sustained counts b-1 and j-1. At the September 2022 disposition hearing, the court removed Aiden from Mother and set a section 366.26 hearing to select a permanent plan. The court ordered no reunification services because Mother "has run out of time."[10]

## M. *Mother Files Her First Section 388 Petition*

Mother continued visiting Aiden, although maternal great-aunt Julia reported Mother did not show affection toward Aiden. Father also began consistently visiting with Aiden. In March 2023, the court set legal guardianship as the permanent plan.

In April 2023, on the same day as the section 366.26 hearing, Mother filed a section 388 petition, requesting the court either return Aiden to her care or grant six more months of reunification services with unmonitored visits. Mother asserted that, since the court's removal of Aiden, she "has completed two parenting programs, has been in therapy since 2021, . . . has continue[d] to participate in weekly psychotherapy through

---

[10] Although the court expressed grave misgivings at doing so, it terminated jurisdiction as to Anthony, based on the recommendations of DCFS's counsel and Anthony's counsel, who both opined Anthony was situated differently than Aiden.

20

BHS[, and] . . . has been substantially involved in regional center services through Passport for Learning and is addressing anger management, and substance abuse history. She [has] been visiting consistently, three times per week." The court set a hearing for mid-June 2023 and continued the section 366.26 hearing to the same date.

DCFS opined that, since the court's most recent removal of Aiden, Mother had "demonstrated behavior change while in visits with the child," noting that Mother had "completed a 12-week parenting course, continues to attend individual counseling, conjoint counseling with Aiden, substance abuse relapse prevention and anger management." DCFS recommended the court grant Mother's petition. In June 2023, the court granted the petition and took the section 366.26 hearing off-calendar.

### N. *The Court Terminates Reunification Services*

In a September 2023 status report, Aiden was reported as thriving with maternal great-aunt Julia but preferring to return home to Mother. Mother had unmonitored visits with Aiden from 10:00 a.m. to 7:00 p.m. on Sundays. Aiden reported Mother no longer yelled at him and instead spoke nicely to him. The pair were making progress in family therapy. Taking into account Mother's progress, DCFS recommended Aiden could begin overnight visits with Mother. In a September 2023 review hearing, the court followed DCFS's recommendation and granted Mother overnight visits.

In November 2023, DCFS received information that Aiden's behavior in class had worsened since he began overnight visits with Mother. Aiden stated he "wants to die and hates his life." Aiden also reported Mother made him drink beer with Father, even though Aiden told Mother he did not want to drink.

A CSW spoke with Aiden who reported that, during the previous overnight visit, Mother and Aiden met up with Father. Aiden told Mother he was thirsty, and Father told him to "have some beer." Aiden did not want to drink but did not know what to do as Mother did not say anything. Aiden had a sip of the beer.

The CSW called Mother. When Mother answered the phone, she immediately said: "I already know why you are calling. I don't know why Aiden is making up lies, I told him if he doesn't want to live here he can stay with his aunt." Mother then said the phone was going to run out of battery and the call ended. Maternal great-aunt Juila told the CSW she had not observed anything amiss when Aiden returned from the previous overnight visit.

The CSW spoke with Mother the following week. Mother claimed she and Aiden ran into Father and did no more than exchange greetings. She denied Aiden drank any beer. However, due to DCFS's concerns, Mother volunteered to return to having her visits monitored. Maternal grandmother (MGM) and the maternal uncle assisted Mother in supervising visits.

In a December 2023 status report, Mother reported that Aiden often talked back to her and, when she tried to impose a consequence for his actions, he would tell her: "[Y]ou can't do anything to me. Ima [*sic*] tell my teacher and the social worker."

In that same report, DCFS noted the paternal aunt had called the CSW to inform her that Mother had given Father access to Aiden more than once. The paternal aunt provided a picture she claimed Mother sent her of Aiden and Father in late October 2023—Aiden appeared to be in a Halloween costume. The aunt also stated Mother had brought Father back to the

22

home where she was staying with the maternal grandparents, and MGM permitted him to enter. The aunt told Mother she would be reporting this information to the CSW because Father "is not doing well with his substance abuse."

At the December 2023 review hearing, the court recognized Mother was a Regional Center client and had intellectual and comprehension issues. Nevertheless, the court noted that Mother had received "extensive" services. Impliedly disbelieving Mother's claim that she and Aiden had just run into Father and exchanged greetings, the court found this to be "a different situation. They are sitting down, visiting. The child says he's thirsty. Instead of giving him water, they're offering him beer. He's ten. This is a serious violation." The court pointed to Mother's "pattern" of "put[ting] things off on other things" (i.e., blaming other events or people instead of her own actions). The court described Mother's claims that Aiden lied about things rather than taking accountability, and telling Aiden not to tell the school when she scolded him. The court also cited to Mother's statement that Aiden "can go back to live with the caregiver," opining this demonstrated a "lack of concern for his well-being and his best interest." The court terminated reunification services and set a section 366.26 hearing. The court granted Mother monitored visits.

### O.  *Mother Files Another Section 388 Petition*

Mother continued visiting with Aiden. Visits took place between 9:00 a.m. and 5:00 p.m. on Saturdays at the grandparents' home and were monitored by MGM. In various status reports, DCFS stated: "Mother indicated that Aiden can be 'difficult' and she expressed that 'Aiden doesn't know what he wants.' Mother stated that she wants what is best for Aiden and

23

if Aiden does not want to return home and [wants to] stay with maternal great aunt then 'he can do what he wants.' Mother stated that Aiden can be a 'liar' sometimes."

In February 2024, Father was arrested.

A CSW monitored a visit with Aiden in April 2024. Mother was appropriate and actively interacted with him. However, at a July 2024 visit, Mother spent most of the time speaking with the CSW about issues unrelated to the case, despite the CSW's "frequent attempts to redirect mother to focus on the child." When Aiden appeared bored, Mother bought him breakfast and gave him her phone. However, after an hour, Aiden asked Mother if he could get his hairline fixed. Mother agreed and interacted with Aiden during the walk to the barbershop.

The CSW observed that Mother seemed to be suffering from paranoia. She "often tells CSW that she is being harassed/followed by father's ex-girlfriend and/or neighbors. Mother would tell CSW incidents that occurred while she is running errands. Mother indicated that father's ex-girlfriend wants to fight her and 'hangs out' around areas that mother frequents." In July, Mother and the CSW were walking out of Mother's apartment building when a neighbor greeted her in a sincere and amicable manner; after the neighbor left, Mother told the CSW, "You see they're always watching me." During that visit, Mother made a comment about Father's girlfriend "hanging out" around the apartment building but did not respond when Aiden said, "[I]sn't that a homeless woman?" Two days later, Mother texted the CSW pictures of what appeared to be a homeless woman and said, "This is why I have cameras at my house because she's trying to get in."

24

In August 2024, Mother filed another section 388 petition, again asking the court to either return Aiden to her custody or reinstate reunification services with unmonitored visits. Among other things, Mother recognized "the Court was concerned about Mother allowing unmonitored contacting between Aid[e]n and Father" and so, "[t]aking the Court's concerns to heart, Mother has had no contact with Father for over six months." Mother also continued to participate in therapy and other life-skills and parenting programs.

### P. *The Court Denies the Petition and Appoints a Legal Guardian*

DCFS's opposition to Mother's petition noted that in mid-September 2024, while a CSW was transporting Aiden to a visit with Mother, Aiden told the CSW he enjoyed visiting with Mother but was bothered when MGM yelled at Mother, or was rude or "mean" to her. Aiden added that a few weeks ago, while he was visiting, Mother, MGM, and the maternal uncle had a "fight," resulting in Mother locking herself in the bathroom because MGM was yelling at her. Aiden was in the living room playing games. The maternal uncle then became upset that Mother would not exit the bathroom and began banging on and hitting the door while cursing at Mother to open the door. Mother refused and waited until the uncle returned to the bedroom.

Aiden also revealed Mother had been accepting calls from Father from jail during Aiden's visits. Because Father did not call the last Saturday, Mother called the jail to ask about him and learned Father was being punished and thus was not allowed to make calls. Aiden said Father asked about school and promised to buy him presents after he was released.

25

During the visit to which the CSW was transporting Aiden, Mother spent most of the time talking with the CSW about Father's girlfriend, issues she had with MGM, and issues with the Regional Center.

When the CSW asked Mother about the incident with the maternal uncle, Mother admitted the uncle had "gotten violent towards her," but had not "hit her." After confirming she had locked herself in the bathroom, she said: "Aiden stayed in the living room because he was dumb. He should have come inside the bathroom." When asked about contacting Father, Mother "quickly denied the claim" and accused Aiden of lying.

The court heard Mother's section 388 petition in October 2024. Mother's counsel asked the court to grant it, noting Mother was still participating in services even though she was no longer required to do so. Counsel added that Aiden and Mother shared a close bond, and there were no safety concerns when the two were together. Aiden's counsel acknowledged the bond between Aiden and Mother but stated he would be "submitting on the Department's recommendation for both 388 and 26 hearing[s] today." DCFS's counsel opposed Mother's request, arguing that despite Mother's ongoing participation in programs, she still had problems controlling her emotions and anger. Counsel also pointed to the incidents with the maternal uncle and Mother's allowing Aiden to have unmonitored contact with Father as well as the fact that she accused Aiden of lying when confronted about the contact with Father. Finally, DCFS voiced concerns with Mother's apparent paranoia.

The court denied Mother's petition "for the reasons set forth by [DCFS's counsel]," stating it was "particularly concerned for those reasons." The court appointed maternal great-aunt

26

Julia as Aiden's legal guardian, and granted Mother a minimum of nine hours of unmonitored visits with Aiden, on the condition that MGM, the maternal uncle, and Father were not present (telephonically or otherwise) at the visits.[11]

Mother timely appealed.

## DISCUSSION

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. (§ 388, subd. (a).) 'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.' " (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.) "We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence." (*Id.* at p. 846.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no

---

[11] In the court's original minute order, Mother was granted "Monitored visits, minimum 3 times per week for 3 hours per visit. Father is not to monitor Mother's visits." Two minutes later, another minute order was entered, differing only in that it granted Mother "Unmonitored visits, minimum 9 hours per week. Father, Maternal Grandmother, and Maternal Uncle are not to be present during visits."

authority to substitute its decision for that of the trial court." ' " (*Stephanie M.*, at p. 319.)

## A. *The Court Did Not Err in Finding No Changed Circumstances*

"To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) Mother argues she demonstrated such a substantial change because, after the court's order terminating reunification services, "[s]he completed individual and conjoint therapy, continued participating in specialized parenting and adaptive living services."

When the court terminated Mother's reunification services for the second time, it pointed to Mother's "pattern" of blaming other people and events rather than taking accountability for the abuse Aiden suffered, her accusations that Aiden lied when he recounted the abuse, her admonition to Aiden not to tell the school if she scolded him, and her seeming indifference to whether Aiden lived with Julia or her. Additionally, as Mother recognizes, the court concluded she "had not adequately demonstrated protective capacity following the November 2023 incident" in which Father told Aiden to drink beer when he was thirsty.

DCFS does not deny Mother continued engaging in classes and programs designed to help ameliorate her parenting issues. But, despite Mother's participation, nothing in the record demonstrates a substantial change in her behavior. When Mother and the maternal uncle got into a "fight" where he "got violent towards her," Mother again did not demonstrate protective capacity. Instead of ensuring Aiden was safe, she locked herself in the bathroom, leaving Aiden in the living room.

28

When later asked about Aiden, instead of claiming he was safe in the living room or expressing remorse for not taking him with her, she ridiculed him as "dumb" for not joining her in the bathroom. Mother also told the court she had no contact with Father for six months as of the time she filed her second section 388 petition. Yet Aiden later informed the CSW that Mother had been accepting calls from Father during Aiden's visits. When the CSW asked Mother about being in contact with Father, Mother accused Aiden of lying.[12] And she expressed that if Aiden wanted to live with Julia, "he can do what he wants." These statements and actions amply support a conclusion that Mother failed to demonstrate a substantial change in circumstances.

Mother also complains the court "failed to consider the role of her intellectual disability in both her challenges and her progress." But she does not explain how her intellectual disability prevented her from knowing she should protect her son. Nothing in the record suggests Mother's intellectual disability prevented her from understanding Aiden should not drink beer at ten years old, or understanding the court was concerned with Father having unmonitored contact with Aiden. There is no link between her intellectual disability and her being untruthful with the court and DCFS about whether she was in contact with

_____

[12] While Mother attempts to argue that DCFS inaccurately portrayed Father as a danger to Aiden, Mother obtained a restraining order against Father both for abusing her and for abusing Aiden. Additionally, both the paternal aunt and paternal grandmother attested to Father's extensive substance abuse problem, and Father offered a 10-year-old boy a beer when he said he was thirsty. We do not agree with Mother that DCFS's "expressions of concern that father presented a serious danger to Aiden were somewhat overstated."

Father.  When confronted about these incidents, Mother did not
express confusion about what she had done wrong—Mother lied.
In fact, not only did Mother lie, Mother also accused Aiden of
lying to cover up her own actions.[13]

In short, on this record, we hold the court acted well within
the bounds of reason in concluding that, despite Mother's
continued participation in programs, the circumstances
surrounding the December 2023 termination of reunification
services had not substantially changed.

### B.    *The Court Did Not Err in Finding Mother's Request Was Not in Aiden's Best Interest*

"[W]hen a child has been placed in foster care because of
parental neglect or incapacity, after an extended period of foster
care, it is within the court's discretion to decide that a child's
interest in stability has come to outweigh the natural parent's
interest in the care, custody and companionship of the child."  (*In
re Jasmon O.* (1994) 8 Cal.4th 398, 419.)  "As to the best interests
element, after the court has bypassed or terminated reunification
services and set the matter for a section 366.26 hearing, the focus
of the case shifts from the parents' interest in the care, custody,
and companionship of the child to the needs of the child for

---

[13] Nor is Mother's citation to *In re K.C.* (2012) 212
Cal.App.4th 323 well taken.  There, the appellate court held that
the father's paranoia did not "relieve the Department of its duty
to tailor services to address that condition, its effects, or both."
(*Id.* at p. 333.)  Here, in contrast, there is no suggestion that
Mother was provided with services that were inappropriate to her
because of her intellectual disability.

permanency and stability." (*In re N.F.* (2021) 68 Cal.App.5th 112, 121.)

Mother argues that granting her additional reunification services would have been in Aiden's best interest because he was bonded with Mother, enjoyed his visits with her, and wanted to reunify. Mother claims there was no indication that granting further services would have undermined Aiden's placement with Julia or that Aiden was experiencing distress due to a lack of permanency.

Even if Aiden did not express distress regarding a lack of permanency, and even if Julia would have been willing to continue caring for Aiden, "[i]n assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616.) And although it is undisputed that Aiden mostly enjoyed his visits with Mother and had expressed his desire to reunify with her, it is also undisputed that when he did reunite with her, DCFS received several referrals alleging physical abuse, Mother frequently expressed frustration at how Aiden allegedly treated her, and the court was ultimately required to remove Aiden for his own safety. Moreover, the court's denial of Mother's petition did not prevent Mother from continuing to visit with Aiden. And, considering Aiden's permanent plan was legal guardianship and not adoption, Mother was not foreclosed from regaining custody of Aiden if she could demonstrate that circumstances had changed and she could safely care for him.

Therefore, we hold the juvenile court did not abuse its discretion in finding that granting Mother's petition was not in Aiden's best interest.[14]

## DISPOSITION

The court's orders are affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

---

[14] Mother's only argument that the court erred in its order under section 366.26 is that it was based on the improper denial of her section 388 petition. Because Mother fails to demonstrate the denial of her section 388 petition was erroneous, her challenge to the court's section 366.26 order fails as well.